**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

**RECEIVED**

NOV 17 2020

CLERK, U.S. DISTRICT COURT
MINNEAPOLIS, MINNESOTA

---

3M COMPANY,

        Plaintiff,

vs.

Individuals, Partnerships, and
Unincorporated Associations identified
in **Schedule "A"**.

        Defendants.

---

CASE NO. _____

**COMPLAINT**

**JURY TRIAL DEMANDED**

---

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff 3M Company ("3M" or "Plaintiff"), by and through its undersigned attorneys, hereby files this Complaint against the Individuals, Partnerships, and Unincorporated Associations identified in **Schedule "A"** hereto (collectively "Defendants"). 3M hereby alleges as follows based on knowledge of 3M's own actions, and on information and belief as to all other matters:

### NATURE OF THE ACTION

1.    3M brings this lawsuit to combat the sale of counterfeit 3M personal protective equipment ("PPE"), and in particular, counterfeit 3M N95 respirator products, offered in this District by Defendants through interactive commercial Internet websites and Internet based e-commerce stores, such as eBay.com, using the seller identities identified in Schedule A (the "Seller Identities").



SCANNED
NOV 17 2020
U.S. DISTRICT COURT MPLS

2.      Defendants are anonymous online sellers who seek to exploit the current COVID-19 pandemic by offering counterfeit 3M N95 respirator products, typically at inflated prices.  Defendants are trading on the reputation and goodwill associated with the famous 3M mark, without 3M's authorization, and are misleading consumers into believing that Defendants are offering authorized, genuine 3M N95 respirator products that meet 3M's standards, when in fact Defendants are selling counterfeit imitations.

3.      Defendants' fraudulent sales of these counterfeit respirators jeopardizes the health and safety of healthcare workers, first responders, and the public who believe they are purchasing genuine 3M N95 respirators that meet the N95 standard. While 3M N95 respirators are subject to strict quality control standards, the products offered by Defendants are of unknown provenance: the public has no way of knowing who is making them, with what materials, and with what (if any) quality control and health safety measures. This unlawful activity poses potentially serious health consequences for the public, justifying immediate judicial intervention.

4.      In addition, by using 3M's name and famous trademarks, trading on 3M's reputation and goodwill, and deceiving customers into believing that they are buying genuine 3M N95 respirators, Defendants' unlawful and unethical activities are causing 3M irreparable harm.

5.      3M therefore brings this action stop Defendants' unlawful exploitation of the COVID-19 pandemic, to protect the public from Defendants' fraudulent and counterfeit commercial activities, and to protect 3M's name and reputation from the harm caused by Defendants' unlawful actions.

6.    . The COVID-19 pandemic is ongoing, and 3M's N95 respirator products remain in high-demand to help reduce the risk of transmission of the novel coronavirus. Immediate judicial intervention is needed to prevent Defendants from continuing to jeopardize the public health by misleading consumers into buying and using counterfeit N95 respirators while laboring under the false impression that they are genuine 3M products that meet the applicable 3M and N95 standards.

7.    3M respectfully requests the Court preliminarily and permanently enjoin Defendants from using 3M's name, logo, branding, all associated trademarks and other intellectual property, and from selling counterfeit 3M-branded respirator products bearing 3M trademarks or any other 3M products.  3M further requests the Court order Defendants to disgorge any profits they have made from these fraudulent transactions, or in the alternative, that it award statutory damages for Defendants' counterfeit activities, along with any other appropriate relief.  3M has committed to donating any monetary recovery in this action to COVID-19 charitable organizations.

## BACKGROUND

8.    Throughout its history, 3M has been a leader in innovation and developing healthcare and safety products for industry and consumers throughout the world. 3M's PPE—and in particular 3M's N95 respirator products—are considered the gold standard for public health protection.

9.    Over the last hundred-plus years, 3M has invested hundreds of millions of dollars to advertise and promote its 3M-branded products, including, without limitation, its 3M-branded respirator products. During this time, 3M continuously used its 3M trademarks

in commerce. Through this substantial investment and its extensive and continuous use of the famous 3M trademarks, 3M has established goodwill and an acclaimed reputation among the general public and healthcare and safety professionals for its high quality, safe and reliable products. Consumers associate the 3M marks uniquely with 3M, and now, more than ever, consumers rely on the famous 3M marks to indicate that the products offered thereunder are of the same superior quality that consumers have come to expect over the past century. This is especially true with respect to 3M's numerous industry-leading healthcare and PPE products, including Plaintiff's 3M-branded N95 respirators.

10.     Healthcare professionals and other first responders are heroically placing their health and safety on the line to battle COVID-19, and 3M's N95 respirator products are critical to those individuals and groups on the front lines combating COVID-19. First responders, healthcare professionals, and the public have come to depend on the quality and dependability that the 3M brand signifies. In an effort to meet the heightened demand for 3M N95 respirators during the pandemic, 3M has increased its production of N95 respirator products to unprecedented levels. Since the COVID-19 pandemic began in January 2020, 3M has doubled its global production rate of N95 respirators to 1.1 billion per year, or 100 million per month. 3M is continuing to invest in the capital and resources it needs to further increase its production capacity to two billion per year globally.

11.     The demand for 3M-branded respirators has grown exponentially in response to the pandemic, and 3M has been committed to seeking to meet this demand while keeping its respirators priced fairly. 3M is working with customers, distributors, governments, and medical officials to direct 3M supplies to where they are needed most. Importantly, 3M has

not increased its U.S. prices for disposable N95 respirators as a result of the pandemic.

12.    Unfortunately, a number of wrongdoers are seeking to exploit the current public health emergency and prey on innocent parties through a variety of scams involving 3M N95 respirators and other 3M PPE products in high demand. These scams include unlawful price-gouging, fake offers, counterfeiting, and other unfair and deceptive practices—all of which undercut the integrity of the marketplace and constitute an ongoing threat to public health and safety.

13.    In response to fraudulent activity, price-gouging and counterfeiting related to N95 respirators that has spiked in the marketplace in response to the pandemic, 3M is taking an active role to combat these activities. 3M's actions include working with law enforcement authorities around the world, including the Department of Justice, state Attorneys General, the Federal Bureau of Investigation, and local authorities to combat price-gouging and other unlawful activities. 3M has established a dedicated point of contact for federal and state procurement officials to promptly validate third-party offers and quotes. In doing so, 3M has already helped prevent dozens of potentially fraudulent transactions with federal agencies, state governments, municipal governments, private enterprises and other organizations. 3M is in regular contact with numerous governors and state attorneys general regarding these efforts to prevent and combat fraud. The Department of Justice has publicly thanked 3M for the assistance it has provided in investigations that have led to arrests. *See* Press Release: New Jersey Man Arrested For $45 Million Scheme To Defraud And Price Gouge New York City During COVID-19 Pandemic, available at https://www.justice.gov/usao-sdny/pr/new-jersey-man-arrested-45-million-scheme-

defraud-and-price-gouge-new-york-city-during (May 26, 2020), attached hereto as Exhibit 1.

14.     3M has also created a COVID-19 Fraud Hotline, where the public can report to 3M suspected cases of fraud, price-gouging, and counterfeit activities in connection with 3M PPE.  In addition, 3M has publishing information about its anti-price-gouging and counterfeiting efforts on the 3M website (*see* http://3M.com/covidfraud.com) including disclosure of 3M's list prices for the most common models of its N95 respirators so that customers can identify and avoid inflated prices, and the web address and phone numbers that can be used to identify 3M authorized distributors and dealers in the United States and Canada. A true and correct copy of this publication is attached hereto as **Exhibit 2**.

15.     3M does not—and will not—condone individuals or entities deceptively trading off the fame and goodwill of the 3M name and marks for criminal gain. This is particularly true against those who seek to exploit the surge in demand for 3M-branded products during the global COVID-19 pandemic.

16.     3M has already filed over twenty lawsuits in connection with its fight against fraud, price gouging, and counterfeiting, and has sent dozens of cease and desist letters against numerous bad actors perpetrating fraud amidst the COVID-19 pandemic.   3M has further assisted in investigations resulting in the seizure of thousands of counterfeit respirators throughout the world. *See* Exhibit 3, "3M's efforts on N95 crackdown leads to raids in Vietnam, U.A.E." Minn. Star Tribune, October 5, 2020 (available at https://www.startribune.com/3m-s-efforts-on-counterfeit-n95-mask-crackdown-leads-to-raids-in-vietnam-u-a-e/572638472).

17.   Defendants, like many sellers of counterfeit goods on interactive websites, rely on the supposed anonymity afforded by the Internet to escape detection and liability. Unfortunately, Defendants and similar counterfeiters circumvent the efforts of interactive websites to vet sellers and confirm their identities. They employ numerous strategies to hide their true identities and trade under multiple aliases and handles, in an effort to keep ill-gotten gains beyond the reach of their victims.

18.   Accordingly, to further protect the public from Defendants' fraud and pandemic profiteering, to prevent the proliferation of imitation and counterfeit PPE, and to forestall any further diminution to 3M'sreputation, fame, and goodwill, 3M brings this lawsuit against Defendants for counterfeiting, trademark infringement, false designation of origin, and trademark dilution, based on Defendants' misuse of Plaintiff's trademarks to market and sell counterfeit 3M products.

19.   3M seeks preliminary and permanent injunctive relief. Any damages, costs, or fees recovered by 3M will be donated to charitable COVID-19 relief efforts.

**THE PARTIES**

20.   Plaintiff 3M Company is a Delaware corporation, with a principal place of business and corporate headquarters located at 3M Center, St. Paul, Minnesota 55144. 3M is a diversified technology company with a global presence and is among the leading manufacturers of products for many of the markets it serves, including PPE such as 3M-branded N95 respirators.

21.   Each of the Defendants' maintains or has maintained in the past eBay listings for counterfeit 3M respirators. They are part of a large number of anonymous or

pseudonymous listings for such products on eBay and other online marketplaces which have become rampant during the current pandemic, with most of the products being imported from outside the US. The similarities in Defendants' conduct and the counterfeit 3M products being offered, along with the tactics employed to escape detection and enforcement, logically tie the Defendants together. They not only suggest that Defendants coordinate or otherwise communicate regarding their illegal activity, but also that Defendants' conduct forms part of broader wave of counterfeit activity affecting both 3M and the public at large.

22.    The true names and identities of the Defendants identified in Schedule A are presently unknown. Defendants' use of Seller Identities to conceal their true identities hampers the ability to identify Defendants' identities and location, or to ascertain connections between and among Defendants, as well as any potential connections in their counterfeit network. If Defendants provide additional credible information regarding their identities, 3M will take appropriate steps to amend this Complaint.

## JURISDICTION & VENUE

23. This Court has original subject matter jurisdiction over the claims in this action pursuant to the provisions of the Lanham Act, 15 U.S.C. § 1051, et seq., 28 U.S.C. § 1338(a)-(b), 28 U.S.C. § 1331, and 28 U.S.C. §1121.

24.    This Court may exercise personal jurisdiction over a non-resident of the State in which the Court sits to the extent authorized by State law, whose long-arm statute extends to the limits of constitutional due process. Fed. R. Civ. P. 4(k).

25.    As stated above, Defendants are anonymous sellers using aliases Seller Identities on interactive websites to target their business activities toward consumers in the

United States, including Minnesota and this District, through at least the internet identities and stores identified in <u>Schedule A</u> attached hereto. Defendants have the capacity to be sued pursuant to Federal Rule of Civil Procedure 17(b).

26.     Defendants seek to do business with residents in this District through the use of interactive commercial websites—namely, eBay—offering infringing 3M PPE. Defendants place no restriction on the marketing and sale of counterfeit 3M products to residents of Minnesota and this District. On information and belief, Defendants have sold products bearing infringing and counterfeit versions of 3M's federally registered trademarks to residents of Minnesota and this District. Each of the Defendants is directing tortious activities toward Minnesota and has wrongfully caused 3M irreparable injury, felt uniquely in this State.

27.     By their actions, Defendants are appropriating and misusing 3M's famous mark, causing harm to 3M and the consuming public by, among other things, degrading the value of and tarnishing the goodwill associated with 3M's marks and goods, and engendering confusion among the consuming public regarding the nature and quality of the 3M products in question.

28.     The claims for trademark infringement, counterfeiting, unfair competition, false designation of origin, and trademark dilution, asserted in Counts I – III, *infra*, arise under the Trademark Act of 1946 (as amended; the "Lanham Act"), namely, 15 U.S.C. §§ 1051 *et seq*. Accordingly, this Court has original and subject-matter jurisdiction over Counts I – III pursuant to 28 U.S.C. §§ 1331, 1338(a), and 15 U.S.C. § 1121(a).

29.     The additional claims arising under the Minnesota Statutes, and are so related

to the federal claims asserted in Counts I – III, *infra*, that they form part of the same case or controversy. Accordingly, this Court has supplemental jurisdiction over Counts IV – VII pursuant to 28 U.S.C. §§ 1338(b) and 1367(a).

30.     Defendants have purposefully availed themselves of the privilege of transacting business within the State of Minnesota, including in this District. Defendants have also committed and intentionally directed tortious acts towards residents of the State of Minnesota, including in this District. 3M's claims arise out of and relate to Defendants' transaction of business and tortious acts committed within the State of Minnesota, including in this District. Based on the foregoing, this Court has long-arm jurisdiction over Defendants.

31.     A substantial part of the events giving rise to the claims asserted, *infra*, occurred in this District. Accordingly, venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2). Additionally, Defendants are subject to personal jurisdiction in this District. Accordingly, venue is also proper in this District pursuant to 28 U.S.C. § 1391(b)(3).

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

**I.      Plaintiff 3M**

32.     3M has grown from humble beginnings in 1902 as a small-scale mining venture in Northern Minnesota to what it is today, namely: an industry-leading provider of innovative products throughout the world. Today, 3M's portfolio includes more than 60,000 goods and services, ranging from household and school supplies, to industrial and manufacturing materials, to medical supplies and equipment.

**A.      The 3M Brand**

33.     3M offers its vast array of goods and services throughout the world under

numerous brands, including, for example: ACE; POST-IT; SCOTCH; NEXCARE; and more. Notwithstanding the widespread goodwill and resounding commercial success enjoyed by these brands, 3M's most famous and widely recognized brand is its eponymous "3M" brand.

34.     The 3M brand is associated with products and materials for a wide variety of medical devices, supplies, and PPE, including, for example: respirators; stethoscopes; medical tapes; surgical gowns, blankets, and tape; bandages and other wound-care products; and many more. As a result, 3M-branded products are highly visible throughout hospitals, nursing homes, and other care facilities where patients, care providers, and procurement officers value and rely upon the high quality and integrity associated with the 3M brand.

**B.      The Famous "3M" Marks**

35.     Over the past century, 3M has invested hundreds of millions of dollars in advertising and promoting its 3M-branded products to consumers throughout the world (including, without limitation, its 3M-branded N95 respirators) under the standard-character mark "3M" and the 3M logo shown below (together, the "3M Marks"):



36.     For decades, products offered by 3M under the 3M Marks have enjoyed enormous commercial success (including, without limitation, 3M-branded N95 respirators), with billions of dollars in sales in 2020 alone.

37.     Over the same period of time, products offered under the 3M Marks have regularly been the subject of widespread, unsolicited media coverage and critical acclaim.

38.     Based on the foregoing, consumers associate the 3M Marks uniquely with 3M

and recognize them as identifying 3M as the exclusive source of goods and services offered under the 3M Marks. Based on the foregoing, the 3M Marks have also become famous among consumers in Minnesota and throughout the United States.

39.     To strengthen 3M's common-law rights in and to its famous 3M Marks, 3M has obtained numerous federal trademark registrations, including, without limitation: (i) U.S. Trademark Reg. No. 3,398,329, which covers the standard-character 3M mark in Int. Classes 9 and 10 for, *inter alia*, respirators (the "'329 Registration"); (ii) U.S. Trademark Reg. No. 2,692,036, which covers the 3M logo for, *inter alia*, a "full line of surgical masks, face shields, and respiratory masks for medical purposes" (the "'036 Registration"); and (iii) U.S. Trademark Reg. No. 2,793,534, which covers the 3M design mark in Int. Classes 1, 5, and 10 for, *inter alia*, respirators (the "'534 Registration"). True and correct print-outs of 3M Company's registration certificates for the aforementioned marks are attached hereto as **Exhibits 4, 5, and 6.**

40.     Each of the foregoing Registrations is valid, in effect, and registered on the Principal Trademark Register of the United States Patent & Trademark Office.

41.     Each of the foregoing Registrations is "incontestable" within the meaning of 15 U.S.C. § 1065. Accordingly, each Registration constitutes conclusive evidence of: (i) 3M's ownership of the 3M Marks; (ii) the validity of the 3M Marks; (iii) the validity of the registration of the 3M Marks; and (iv) 3M's exclusive right to use the 3M Marks throughout the United States for, *inter alia*, respirators.

42.     Plaintiff's famous 3M Marks do more than identify 3M as the exclusive source of goods and services offered thereunder. Indeed, the famous 3M Marks also signify to consumers that 3M-branded products offered under the 3M Marks are of the highest

quality and adhere to the strictest quality-control standards. Now, more than ever, consumers rely on the famous 3M Marks' ability to signify that products offered under the 3M Marks are of the same high quality that consumers have come to expect of the 3M brand over the past century.

### C.    3M's Extensive Efforts to Assist with the Battle Against COVID-19

43.    As detailed on 3M's website, 3M is providing its 3M-branded N95 respirator products to healthcare workers, first responders, and the public to help combat the COVID-19 pandemic:



44.    Authentic 3M-branded N95 respirators reduce exposure to airborne biological particles and liquid contamination when appropriately selected, fitted, and worn.

45.    Based on the exponential increase in demand for 3M-branded N95 respirators, 3M has invested in the necessary capital and resources to double its annual production of 1.1 billion N95 respirators. *See* Exs. 1, 2. But 3M has not increased its U.S. prices for disposable N95 respirators as a result of the pandemic. *See id.*

46.    Unfortunately, Defendants and other opportunistic third parties have sought to exploit the increased demand for 3M-branded N95 respirators by selling counterfeit versions of 3M's products, often at inflated prices compared to genuine 3M product.

47.    3M is working diligently with law enforcement, retail partners, and others to combat unethical and unlawful business practices related to 3M-brand N95 respirators in order to protect the public and healthcare professionals from counterfeiting, misleading, and inferior products, to reduce time wasted by healthcare providers and procurement officers on scams, as well as to protect 3M's goodwill, reputation, and carefully curated 3M brand,

48.    As shown in the inset image, additional examples of 3M's efforts to combat price-gouging, counterfeiting, and other unlawful conduct during COVID-19 include:

A.    3M created a form on its website as well as a telephone hotline that the public can use to report suspected incidents of fraud, price-gouging and counterfeiting (*See* **Exhibit 7**);

B.    3M has created online resources to help the public spot incidents of price-gouging, identify counterfeiting, and ensure products are from 3M authorized distributors. *See, e.g.*, https://www.3m.com/3M/en_US/company-us/coronavirus/:



**Fighting Fraud and Counterfeit Activity**

The COVID-19 pandemic has led to unprecedented demand for 3M products. It's also led to unacceptable and unprecedented numbers of bad actors seeking to take advantage of the situation through fraud, counterfeiting and price-gouging. 3M has launched a global effort to combat fraud and price gouging and help protect the public against those who try to exploit the this unprecedented demand.

**Our Fight Against Fraud**
Get more information on how 3M is helping combat fraudulent activity in connection with the COVID-19 pandemic and 3M products.

**Report Concerns**
Report potential fraud by calling our fraud hotline at 1 (800) 426-8688 or through our website.

**Read Actions to Date**
Read the latest on our work to combat fraud, counterfeiting and price-gouging tied to the COVID-19 pandemic.

**N95 Prices**
3M has not raised prices for our N95 respirator models and has published pricing for common 3M N95 models sold in the U.S. to help customers avoid inflated prices.

C.   The 3M website further allows the public to track 3M's enforcement activities against fraudulent activity in connection with 3M products, such as N95 respirator products, during the COVID-19 pandemic. *See* https://news.3m.com/English/3m-stories/3m-details/2020/3M-expands-actions-globally-to-fight-COVID-fraud-counterfeiting-price-gouging/default.aspx:

**3M Enforcement Activities**

To help combat COVID-19 related fraud, 3M has established new 3M hotlines in the U.S. and around the world to help end-users and purchasers of 3M products identify authentic 3M respirators and ensure products are from 3M authorized distributors. 3M has not, and will not, raise prices for its respiratory protection products as a result of the COVID-19 pandemic. 3M has published the current U.S. list prices for many of the most common models of 3M N95 respirators to help customers identify and avoid inflated prices. We have also filed lawsuits in courts across the country against wrongdoers, terminated 3M distributors for engaging in price gouging or violating 3M policy, and collaborated with law enforcement and technology companies to combat fraud.

See the actions 3M has taken to fight fraud, counterfeiting, and price gouging tied to the COVID-19 pandemic.

**Stay current on 3M's enforcement efforts.**

| 3M ACTIONS BY THE NUMBERS (PDF, 111 KB) |
| IN THE NEWS |

D.   To date, 3M has investigated more than 7,700 fraud reports globally, filed over 20 lawsuits, and has been granted nine temporary restraining orders and seven preliminary injunctions.  Additionally, over 13,500 false or deceptive social media posts, over 11,500 fraudulent e-commerce offerings, and at least 235 deceptive domain names have been removed.  *See* https://www.3m.com/3M/en_US/worker-health-safety-us/covid19/covid-fraud/?utm_medium=redirect&utm_source=vanity-url&utm_campaign=3m.com/covidfraud.

E.   3M posted on its website the U.S., per respirator, single case list price for the most common models of its 3M-branded N95 respirators so that

consumers can readily identify inflated pricing (*See* **Exhibit 2**), as shown here:

| Model | Type | List Price (USD) |
|---|---|---|
| 1804 | Surgical | $0.68 |
| 1804S | Surgical | $0.68 |
| 1860 | Surgical | $1.27 |
| 1860S | Surgical | $1.27 |
| 1870+ | Surgical | $1.78 |
| 8210 | Standard | $1.02 - $1.31 |
| 8210Plus | Standard | $1.18 - $1.50 |
| 8210V | Standard | $1.48 - $1.88 |
| 8110S | Standard | $1.08 - $1.37 |
| 8200 | Standard | $0.63 - $0.80 |
| 8511 | Standard | $2.45 - $3.11 |
| 9105 | Standard | $0.64 - $0.81 |
| 9105S | Standard | $0.64 - $0.81 |
| 9210+ | Standard | $1.40 - $1.78 |
| 9211+ | Standard | $2.68 - $3.40 |

## II.   Defendants' Unlawful Conduct

49.    Despite 3M's extensive measures to combat price-gouging and counterfeiting of its 3M-branded N95 respirators, illicit activities by bad actors continue.

50.    Defendants are a prime example of this unlawful behavior, which is damaging the 3M brand and jeopardizing the public's health and safety in a time of unprecedented crisis. Defendants' conduct also undermines public trust in the 3M trademarks and 3M's goodwill at a time when the consuming public in this District and throughout the country seeks reliable PPE to safeguard against transmission of the novel coronavirus.

51.    Counterfeit sellers like Defendants employ strategies to avoid risks associated with being shut down through takedown requests to e-commerce websites, acquiring

multiple seller aliases for the purpose of offering counterfeit 3M products. These seller alias registration strategies help to conceal their identities and further hamper efforts to detect the full scope of the often-shadowy counterfeiting operations underlying Defendants' conduct.

52.    Recently, 3M learned of Defendants' online sales of counterfeit 3M products. From 3M's review of the relevant product listings, 3M has determined Defendants to be offering counterfeit goods bearing the 3M Marks. Both product listings and the counterfeit 3M products offered by Defendants often contain similar irregularities and indicia of being counterfeit, suggesting potential coordination among Defendants, or a common source of counterfeit goods.

53.    3M has not provided any authorization or license to Defendants to use the 3M Marks in connection with their advertisement, marketing, sale, distribution and/or shipment of 3M products, much less counterfeit 3M products. On information and belief, Defendants intentionally, knowingly and willfully have used and continue to use the 3M Marks in connection with advertisement, marketing, sale, distribution and/or shipment of counterfeit 3M products into the United States and Minnesota by means of interactive Internet websites.

54.    Defendants' unauthorized use of the 3M Marks in connection with the advertising, distribution, offering for sale, and sale of Counterfeit 3M products into the United States, including Minnesota, is likely to cause and has caused confusion, mistake, and deception by and among consumers and is irreparably harming both consumers and 3M. Among other things, Defendants' unlawful conduct risks the health and safety of the public, impairs the supply chain supporting healthcare workers and others, and damages 3M's brand and goodwill.

-17-

55.     Defendants' conduct must be stopped immediately to prevent additional consumers from unknowingly buying and using counterfeit products that they mistakenly believe will provide protection from COVID-19. In reality, Defendants' counterfeit 3M N95 respirators likely have not undergone any testing, and may not perform to regulatory standards. This creates an enormous and imminent risk to the health and safety of those who purchase and use Defendants' counterfeit products, occasioning harms that are both irreparable and incalculable.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
*(Trademark Infringement and Counterfeiting*

*Under the Lanham Act, 15 U.S.C. §§ 1114, 1117)*

56.     3M repeats and incorporates by reference the foregoing statements and allegations as though set forth fully herein.

57.     Count I is a claim for federal trademark counterfeiting and trademark infringement under 15 U.S.C. § 1114.

58.     3M is the exclusive owner of each of the federally registered 3M Marks.

59.     3M has the exclusive right to use each of the 3M Marks in United States commerce for, *inter alia*, advertising, promoting, offering for sale, and selling Plaintiff's 3M-branded N95 respirators.

60.     3M's exclusive rights in and to each of the 3M Marks predate any rights that Defendant could establish in and to any mark that consists of "3M" in whole and/or in part.

61.     Each of the 3M Marks are inherently distinctive.

62.     Each of the 3M Marks identifies 3M as the exclusive source of products offered under the 3M Marks (including, without limitation, 3M-branded N95 respirators) and, therefore, the 3M Marks have acquired distinctiveness.

63.     Defendants are using the 3M Marks in commerce to advertise, promote, offer for sale, and sell and distribute counterfeit 3M-branded respirators, including through the use of interactive websites facilitating such conduct.

64.     Defendants' use of the 3M Marks in commerce on, for, and/or in connection with the advertising, promotion, offering for sale, and/or sale of products, as alleged, herein, is causing, and is likely to continue to cause, consumer confusion, mistake, and/or deception about whether Defendants are 3M, and/or whether Defendants are licensees, authorized distributors, and/or affiliates of 3M and/or products that 3M offers under its 3M Marks, including, without limitation, 3M-branded N95 respirators.

65.     Defendants' use of the 3M Marks in commerce on, for, and/or in connection with the advertising, promotion, offering for sale, and/or sale of products, as alleged, herein, is causing, and is likely to continue cause, consumer confusion, mistake, and/or deception about whether Defendants' products are affiliated, connected, and/or associated with 3M and/or products that 3M offers under its 3M Marks, including, without limitation, 3M-branded N95 respirators.

66.     Defendants' use of the 3M Marks in commerce on, for, and/or in connection with the advertising, promotion, offering for sale, and/or sale of products, as alleged, herein is causing, and is likely to continue to cause, consumer confusion, mistake, and/or deception

about whether Defendants and/or Defendants' products originate with, and/or are sponsored or approved by, and/or offered under a license from, 3M.

67.    3M has not consented to the use of its famous 3M Marks by Defendants.

68.    Defendants reproduce, counterfeit, copy, and/or colorably imitate the registered 3M Marks and apply such reproductions, counterfeits, copies and/or colorable imitations of the 3M Marks to labels, signs, prints, packages, wrappers, receptacles and/or advertisements in connection with the sale, offering for sale, distribution, or advertising of goods or services, which conduct is likely to cause confusion, or to cause mistake, or to deceive consumers.

69.    Based on 3M's longstanding and continuous use of its 3M Marks in United States commerce, as well as the federal registration of the 3M Marks, Defendants had actual and constructive knowledge of 3M's superior rights in and to the 3M Marks when Defendants began using the 3M Marks as part its bad-faith scheme to confuse and deceive consumers, as alleged, herein.

70.    Upon information and belief, Defendants adopted and used the 3M Marks in furtherance of Defendants' willful, deliberate, and bad-faith scheme of trading upon the extensive consumer goodwill, reputation, fame, and commercial success of products that 3M offers under its 3M Marks, including, without limitation, 3M-brand N95 respirators.

71.    Upon information and belief, Defendants have made, and will continue to make, substantial profits and gain from their unauthorized use of the 3M Marks, to which Defendant are not entitled at law or in equity.

72.     Defendants' acts and conduct complained of herein constitute actionable infringement in violation of 15 U.S.C. § 1114.

73.     3M has suffered, and will continue to suffer, irreparable harm from Defendants' acts and conduct complained of herein, unless restrained by law. The damage suffered by 3M is exacerbated by the fact that Defendants are advertising and offering for sale counterfeit 3M-branded N95 respirators during a global pandemic when 3M's products are necessary and relied upon to protect public health. Such conduct invites public criticism of 3M and the manner in which 3M's N95 respirators are being distributed and sold during the COVID-19 pandemic, and is likely to cause confusion about 3M's role in the marketplace for respirators that are essential to safeguarding public health. Whereas 3M's corporate values and brand image center around the application of science to improve lives, Defendants' conduct imminently and irreparably harms 3M's brand and puts the public's health and safety at risk.

74.     3M has no adequate remedy at law.

## SECOND CLAIM FOR RELIEF

*(Unfair Competition, False Designation of Origin - 15 U.S.C. § 1125(a))*

75.     3M repeats and incorporates by reference the foregoing statements and allegations as though set forth fully herein.

76.     Count II is a claim for federal unfair competition, false endorsement, false association, and false designation of origin under 15 U.S.C. § 1125(a)(1)(A).

77.     Upon information and belief, Defendants' acts and conduct complained of herein constitute unfair competition, false endorsement, false association, and/or false designation of origin in violation of 15 U.S.C. § 1125(a)(1)(A).

78.     Upon information and belief, Defendants' use of Plaintiff's famous 3M Marks to advertise, market, offer for sale, and/or sell purported 3M-branded N95 respirators to consumers, in general, and during a global pandemic such as COVID-19, specifically, also constitutes unfair competition in violation of 15 U.S.C. § 1125(a)(1)(A).

79.     By using the 3M Marks in connection with the sale of counterfeit products, Defendants create a false designation of origin and a misleading representation of fact as to the origin and sponsorship of the counterfeit products.   Defendants' conduct constitutes willful false designation of origin and misrepresentation of fact as to the origin and/or sponsorship of the counterfeit products to the general public under 15 U.S.C. §§ 1114, 1125.

80.     3M has suffered, and will continue to suffer, irreparable harm from Defendants' acts and conduct complained of herein, unless restrained by law. 3M has no adequate remedy at law.

### THIRD CLAIM FOR RELIEF

*(Trademark Dilution Under Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c))*

*(Dilution of the Famous 3M Marks)*

81.     3M repeats and incorporates by reference the foregoing statements and allegations as though set forth fully herein.

82.     Count III is a claim for federal trademark dilution under 15 U.S.C. § 1125(c).

83.     The 3M Marks are famous and have been famous at all times relevant to this action. The 3M Marks were famous before and at the time Defendants began using the 3M Marks in commerce on, for, and/or in connection with the advertising, promotion, offering for sale, and/or sale of products (including, without limitation, 3M-branded N95 respirators).

84.     Defendants' use of Plaintiff's famous 3M Marks in commerce on, for, and/or in connection with the advertising, promotion, offering for sale, and/or sale of products (including, without limitation, 3M-branded N95 respirators) is likely to dilute the distinctive quality of the famous 3M Marks, such that the famous 3M Marks' established selling power and value will be whittled away.

85.     Defendants' use of the famous 3M Marks in commerce on, for, and/or in connection with the advertising, promotion, offering for sale, and/or sale of counterfeit products (including, without limitation, 3M-branded N95 respirators) in general, and during a global pandemic such as COVID-19, specifically is likely to dilute and tarnish the reputation of the famous 3M Marks, such that the famous 3M Marks' established ability to indicate the superior quality of Products offered under such Marks (including, without limitation, 3M-branded N95 respirators), will be impaired.

86.     Defendants' misconduct threatens to harm the reputation of the 3M Marks, constituting dilution by tarnishment of the famous 3M Marks.

87.     Defendants' acts and conduct complained of herein constitute trademark dilution in violation of 15 U.S.C. § 1125(c).

88.     3M has no adequate remedy at law.

## FOURTH CLAIM FOR RELIEF

*(Unlawful Trade Practices – Minn. Stat. § 325D.44)*

89.     3M repeats and incorporates by reference the foregoing statements and allegations as though set forth fully herein.

90.     Count IV is a claim for Unlawful Trade Practices under Minnesota Statute § 325D.44.

91.     3M owns the 3M Mark, which is a valid and protectible trademark.

92.     Defendants' use of the 3M Mark in connection with goods or services constitutes trademark infringement and unfair trade practices under Minnesota Statutes, § 325D.44 because Defendants' use:

a       causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

b       causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another;

c       represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have; and/or

d       otherwise creates a likelihood of confusion or of misunderstanding.

93.     Defendants' infringement is intentional, willful, malicious, and in bad faith.

94.     3M has no adequate remedy at law.

95.    3M has suffered, and will continue to suffer, irreparable harm from Defendants' acts and conduct complained of herein, unless restrained by law. As a result of Defendants' unlawful conduct, 3M is entitled to the injunctive remedies specified in the Prayer for Relief, damages in an amount in excess of $75,000 to be proven at trial, applicable interest, and recovery of all reasonable attorneys' fees and costs incurred herein.

### FIFTH CLAIM FOR RELIEF

*(Trademark Infringement – Minn. Stat. § 333.28)*

96.    3M repeats and incorporates by reference the foregoing statements and allegations as though set forth fully herein.

97.    Count V is a claim for trademark infringement under Minnesota state law (Minn. Stat. § 333.28).

98.    The 3M Mark is a valid and protectable trademark.

99.    Defendants' actions are likely to cause confusion, to cause misrepresentation, to cause mistake, and/or to deceive the public as to the affiliation, approval, sponsorship or connection between Defendants and 3M.

100.    Defendants' actions constitute trademark infringement under Minn. Stat. § 333.28.

101.    3M has no adequate remedy at law.

102.    As a result of Defendants' conduct, 3M has suffered, and will continue to suffer, irreparable injury to its rights, and has suffered, and will continue to suffer,

substantial loss of goodwill and loss in the value of its trademarks, unless and until Defendants are enjoined from continuing their wrongful acts.

103.   As result of Defendants' unlawful conduct, 3M is entitled to the injunctive remedies specified in the Prayer for Relief, damages in an amount in excess of $75,000 to be proven at trial, applicable interest, and recovery of all reasonable attorneys' fees and costs incurred herein.

## SIXTH CLAIM FOR RELIEF

### *(Trademark Dilution – Minn. Stat. § 333.285)*

104.   3M repeats and incorporates by reference the foregoing statements and allegations as though set forth fully herein.

105.   Count VI is a claim for trademark dilution under Minnesota state law (Minn. Stat. § 333.285).

106.   The 3M Mark is a famous mark in the United States, including in the State of Minnesota.

107.   Defendants began using the 3M Mark in connection with the advertising, marketing, and promotion of products subsequent to the 3M Mark becoming famous.

108.   Defendants' advertising, marketing, and promotion of products, through its use of the 3M Mark, causes dilution by lessening the capacity of 3M to identify and distinguish the its products and services.

109.   Defendants have caused the dilution of the distinctive quality of the 3M Mark and lessened the capacity of the 3M Mark to identify and distinguish 3M's products and services.

110.   Defendants' conduct has caused, and will continue to cause, irreparable harm to 3M.

111.   3M has no adequate remedy at law. Thus, 3M is entitled to a permanent injunction enjoining Defendant from engaging in further acts of dilution.

112.   Defendants' conduct was intentional, willful, malicious, and in bad faith, thereby entitling 3M to treble damages, including attorneys' fees, pursuant to Minn. Stat. § 333.29.

113.   As result of Defendants' unlawful conduct, 3M is entitled to the injunctive remedies specified in the Prayer for Relief, damages in an amount in excess of $75,000 to be proven at trial, applicable interest, and recovery of all reasonable attorneys' fees and costs incurred herein.

## SEVENTH CLAIM FOR RELIEF

*(Minnesota Consumer Fraud Act– Minn. Stat. § 325F.69)*

114.   3M repeats and incorporates by reference the foregoing statements and allegations as though set forth fully herein.

115.   Count VII is a claim for relief under the Minnesota Consumer Fraud Act (Minn. Stat. § 325F.69).

116.   Defendants used or employed false pretenses, misrepresentations, misleading statements, and/or deceptive practices, with the intent that others rely thereon in connection with the sale of merchandise.

-27-

117.   Defendants' conduct is enjoinable as provided in Minn. Stat. § 325F.69 and Minn. Stat. § 325F.70.

118.   3M has standing to pursue this claim under the Private Attorney General Statute, Minn. Stat. § 8.31, subd. 3a. 3M seeks to protect the public by suppressing and preventing Defendants' unfair, misleading, deceptive, or fraudulent representations and/or trade practices as described herein.

119.   As result of Defendants' unlawful conduct, 3M is entitled to the injunctive remedies specified in the Prayer for Relief, damages in an amount in excess of $75,000 to be proven at trial, applicable interest, and recovery of all reasonable attorneys' fees and costs incurred herein.

## **PRAYER FOR RELIEF**

**WHEREFORE**, based on Defendants' conduct complained of, herein, Plaintiff asks this Court:

A.      To enter an Order, finding in Plaintiff's favor on each Claim for Relief asserted herein;

B.      Pursuant to 15 U.S.C. § 1116:

1. To preliminarily and permanently enjoin Defendants, their agents, servants, employees, officers and all persons and entities in active concert and participation with them from using the 3M Marks—or any reproductions, counterfeit copies or colorable imitations

thereof in any manner, as well as any other mark(s) confusingly similar thereto— for, on, and/or in connection with the manufacture, distribution, advertising, promoting, offering for sale, and/or sale of any goods that do not constitute genuine 3M product, or is not authorized by 3M to be sold in connection with the 3M Marks, including, without limitation, 3M-branded N95 respirators;

2.   To preliminarily and permanently enjoin Defendants, their agents, servants, employees, officers and all persons and entities in active concert and participation with them from (i) passing off, inducing, or enabling others to sell or pass off any product as a genuine 3M product that is not produced under the authorization, control, or supervision of 3M and approved by 3M for sale under the 3M Marks; (ii) committing any acts calculated to cause consumers to believe that Defendants' counterfeit 3M products are sold under the authorization, control or supervision of 3M, or are sponsored by, approved by, or otherwise connected with 3M; (iii) further infringing the 3M Marks or otherwise damaging 3M's goodwill; (iv) shipping, distributing, warehousing, or otherwise participating in the storage, distribution, or disposal of counterfeit 3M products;

3.   To Order that, upon 3M's request, online marketplace platforms hosting the Seller Identities (e.g., eBay) provide identifying information for the Seller Identities, and shall cooperate to disable and cease displaying any advertisements used by or associated with Defendants in connection with the sale of counterfeit and infringing goods using the 3M Marks;

4.  To order Defendants to file with the Court and serve upon Plaintiff's counsel, within 30 days after service of the order of injunction, a report in writing under oath setting forth in detail the manner and form in which Defendant has complied with the injunction;

C.   Pursuant to 15 U.S.C. § 1117:

1.  To order Defendants to provide 3M with a full accounting of all distribution and sale of products under the 3M Marks (including, without limitation, 3M-branded N95 respirators), as well as all profits derived therefrom;

2.  To order Defendants to disgorge and pay to 3M all of Defendants' profits derived from the sale of infringing and counterfeit goods offered under the 3M Marks (including, without limitation, 3M-branded N95 respirators);

3.  To award 3M—for donation to charitable COVID-19 relief efforts—treble damages in connection with Defendants' infringement of the 3M Marks;

4.  To find that Defendants' acts and conduct complained of herein render this case "exceptional"; and

5.  To award 3M—for donation to charitable COVID-19 relief efforts—its costs and reasonable attorneys' fees incurred in this matter; or

6.  In the alternative, to award 3M statutory damages pursuant to 15 U.S.C. § 1117(c) of not more than $2,000,000 for each counterfeit mark used by Defendants for each type of goods sold, offered for sale, or distributed, as the Court considers just.

D.   Pursuant to 15 U.S.C. § 1118, to order the destruction of any unauthorized goods and materials within the possession, custody, and control of Defendants that bear, feature, and/or contain any copy or colorable imitation of 3M's Marks;

E.      Pursuant to Minnesota Statutes:

1.      To award 3M— for donation to charitable COVID-19 relief efforts—treble damages in connection with Defendants' illegal acts;

2.      To award 3M—for donation to charitable COVID-19 relief efforts—its costs and reasonable attorneys' fees incurred in this matter;

F.      To award such further restitution as authorized by law, which 3M will donate to charitable COVID-19 relief efforts;

G.      To award Plaintiff pre-judgment and post-judgment interest against Defendants, which 3M will donate to charitable COVID-19 relief effort;

H.      To award Plaintiff such other relief that the Court deems just and equitable;


********************

-31-

## DEMAND FOR JURY TRIAL

3M hereby requests a trial by jury for all issues so triable, pursuant to Fed. R. Civ. P. 38(b) and 38(c).

Dated:  November 17, 2020

**GREENE ESPEL PLLP**

s/ Sybil L. Dunlop
Jenny Gassman-Pines, Reg. No. 386511
Sybil L. Dunlop, Reg. No. 0390186
222 S. Ninth Street, Suite 2200
Minneapolis, MN 55402
jgassman-pines@greeneespel.com
sdunlop@greeneespel.com
(612) 373-0830

**PIRKEY BARBER PLLC**

Christopher Weimer (pro hac vice forthcoming)
Alexandra Bistline (pro hac vice forthcoming)
David Armendariz (pro hac vice forthcoming)
1801 East 6th Street, Suite 300
Austin, Texas 78702
Telephone:   (512) 322-5200
Facsimile:    (512) 322-5201
cweimer@pirkeybarber.com
abistline@pirkeybarber.com
darmendariz@pirkeybarber.com

*Attorneys for Plaintiff 3M Company*