RECEIVED

NOV 17 2020

CLERK, U.S. DISTRICT COURT
MINNEAPOLIS, MINNESOTA

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

3M COMPANY,

      Plaintiff,

    vs.

Individuals, Partnerships, and
Unincorporated Associations identified
in **Schedule "A"**.

      Defendants.

CASE NO. _____

## PLAINTIFF 3M COMPANY'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR A TEMPORARY RESTRAINING ORDER, AN ORDER RESTRAINING ASSETS, AND EXPEDITED DISCOVERY

### INTRODUCTION

As the COVID-19 public health emergency enters its tenth month, demand for trustworthy personal protective equipment ("PPE") remains extraordinarily high. This is especially true for respirator products (often colloquially called "masks"), of which 3M's N95 respirators are perhaps the best-known and considered the "gold standard" in the industry. *See, e.g.,* https://www.startribune.com/3m-s-efforts-on-counterfeit-n95-mask-crackdown-leads-to-raids-in-vietnam-u-a-e/572638472/. As an industry-leading manufacturer of PPE, 3M has seen the demand and necessity of its products rise considerably in the face of the COVID-19 pandemic, with a particular focus on its N95 respirators, which significantly reduce the potential for transmission of airborne biological particles. 3M has drastically ramped up its production to meet this need. At the same time,



SCANNED

NOV 17 2020

U.S. DISTRICT COURT MPLS

3M has not increased its U.S. prices for disposable N95 respirators as a result of the pandemic, despite increased demand and diminishing global supply.

Defendants are anonymous online sellers who seek to exploit the current COVID-19 pandemic by offering counterfeit 3M N95 respirator products online, typically at inflated prices. Seeking to exploit and capitalize on this increased demand and scarcity, Defendants have been engaging in schemes to sell counterfeit 3M N95 respirators to the public, including through online e-commerce marketplaces like eBay. Defendants' counterfeiting activities are a prime example opportunistic pandemic profiteering: exploiting a public-health emergency for personal gain, at the public's expense.

Knowing that effective respirators are key to permitting healthcare professionals, first responders, and others to do their jobs while minimizing the potential for transmission of the novel coronavirus, Defendants and other counterfeiters misuse 3M's reputation, goodwill, and famous trademarks to deceive consumers and sell fake products. This misconduct poses a serious and imminent threat to the health and safety of the consumers who believe they are buying and using genuine 3M N95 respirators that meet the N95 standard, when in fact the origin, quality, and efficacy of Defendants' counterfeit products are completely unknown. To make matters even worse, Defendants often sell their bogus products at inflated prices, meaning that duped consumers are made to pay more for fake product than they would for the genuine article from an authorized source. And Defendants are doing so while hiding behind the near-complete anonymity that online stores and auction sites afford private sellers.

In addition to this significant public health risk, Defendants' actions are further

damaging 3M and its brand, which the public has come to rely on for high quality and effective PPE. Consumers purchasing 3M-branded products should be able to do so with the confidence that those products are of the quality and effectiveness that the public has come to expect and trust from 3M.

Defendants' misconduct needs to stop immediately. 3M respectfully requests that this Court enter a temporary restraining order to stop the incalculable harm to the general public and to 3M that Defendants are actively causing through sale of counterfeit 3M goods. 3M also requests that the Court enter an order directing eBay to provide discovery to permit the identification of Defendants and the payment methods involved so that they can no longer carry out their misdeeds under the cloak of anonymity and be held accountable for their actions. To that end, 3M seeks entry of temporary orders to restrict and freeze the assets in Defendants' payment accounts associated with their eBay seller accounts pending the outcome of this litigation.

## STATEMENT OF FACTS

### I.  COVID-19 and the Global Pandemic

Use of effective respiratory protection has emerged as a key tool in combatting the propagation of the highly contagious COVID-19 virus. Because the virus is believed to pass from person-to-person via respiratory droplets, current health and safety guidelines recommend that healthcare professionals and first responders wear respiratory protection, like 3M's N95 respirators, when interacting with infected or potentially infected patients. Such use is intended to minimize the risk of exposure to the virus, as authentic N95 respirators reduce exposure to airborne biological particles and liquid contamination when

appropriately selected, fitted, and worn over the nose and mouth. [Stobbie Decl ¶ 5.]. The 3M-branded N95 respirators are one of three respirator levels that meet the National Institute of Occupational Safety and Health standards for minimum filtration efficiency levels as prescribed by regulation 42 C.F.R. Part 84. [*See* Stobbie Decl ¶ 6.].

## II. The Parties and Their Products

### a. 3M, the 3M Brand, and the Famous 3M Trademarks

For decades, 3M has been an industry-leading provider of scientific, technical, and marketing innovations across the globe. 3M's current portfolio includes more than 60,000 good and services, ranging from household and school supplies, to industrial and manufacturing materials, to medical supplies and equipment. [Gannon Decl. ¶ 5]. While 3M offers its goods and services under numerous well-known brands and marks, its most famous and widely recognized brand is its eponymous "3M" brand. [*Id.*]. The 3M brand is associated with countless goods and services, including most notably for purposes of this litigation, medical devices, supplies, and PPE, including, for example, respirators; stethoscopes; medical tapes; surgical gowns, blankets, and tape; bandages and other wound-care products; and many others. [Gannon Decl. ¶6]. As a result, 3M products are highly visible and well recognized in hospitals and other healthcare facilities where patients, healthcare providers, and procurement officers value and rely upon the high quality and integrity associated with the 3M brand. [*Id.*].

Over the past century, 3M has invested hundreds of millions of dollars advertising and promoting its 3M-branded products—including its N95 respirators—to consumers all over the world under the standard character mark ("3M") and the 3M logo shown below

(together, the "3M Marks"):

**3M**

[Gannon Decl. ¶10]. In that time, products offered under the 3M Marks have enjoyed enormous commercial success, with billions of dollars in sales in 2019 alone, and have been the subject of widespread, unsolicited media coverage and critical acclaim. [Gannon Decl. ¶¶9 – 10.]

As the result of 3M's marketing and promotion of its 3M Marks, and the critical and commercial success of products and services bearing the mark, 3M has developed substantial goodwill in the 3M Marks. Consumers associate the 3M Marks uniquely with 3M and recognize them as identifying 3M as the exclusive source of goods and services offered under the 3M Marks. The 3M Marks have also become famous among consumers in Minnesota and throughout the United States. [Gannon Decl. ¶18]

In addition to the strong common-law trademark rights that 3M has developed in the 3M Marks, 3M has also obtained numerous federal trademark registrations for the 3M Marks, including but not limited to U.S. Trademark Reg. No. 3,398,329, which covers the standard-character 3M mark in Int. Classes 9 and 10 for, inter alia, respirators (the "'329 Registration"); (ii) U.S. Trademark Reg. No. 2,692,036, which covers the 3M logo for, inter alia, a "full line of surgical masks, face shields, and respiratory masks for medical purposes" (the "'036 Registration"); and (iii) U.S. Trademark Reg. No. 2,793,534, which covers the 3M design mark in Int. Classes 1, 5, and 10 for, inter alia, respirators (the "'534 Registration"). [Gannon Decl. ¶¶ 11–17]. Additionally, each of the listed registrations is

"incontestable" pursuant to 15 U.S.C. § 1065, meaning that the registrations themselves constitute conclusive evidence of (i) 3M's ownership of the 3M Marks; (ii) the validity of the 3M Marks; (iii) the validity of the registration of the 3M Marks; and (iv) 3M's exclusive right to use the 3M Marks throughout the United States for, *inter alia*, respirators.

### b. 3M Personal Protective Equipment During the Pandemic

3M has been committed to getting personal protective equipment, including 3M-branded N95 respirators, to medical professionals and first responders around the world as they place their health and safety on the line to confront the COVID-19 pandemic. [Stobbie Decl. ¶8]. Authentic, effective N95 respirators are critical in this fight: 3M's N95 respirators can help prevent virus-carrying particles from reaching the wearer when appropriately selected, fitted, and worn over the mouth and nose. [Stobbie Decl. ¶5.].

As the pandemic continues unabated, demand for N95 respirators has exploded. 3M has worked tirelessly to produce and supply healthcare workers and first responders with millions of 3M-branded N95 respirators. [Stobbie Decl. ¶¶ 7-8.] Beginning in January 2020, 3M began increasing its production of 3M-branded respirators, doubling its global output to a rate of 1.1 billion per year, or 100 million per month. [Stobbie Decl. ¶8]. 3M has also been investing in the capital and resources to enable it to double its respirator production capacity once again, to two billion globally before the end of 2020. [Stobbie Decl. ¶8]. In the U.S., significant quantities of 3M's respirators have gone to healthcare and public health users, with additional respirators deployed to other critical industries such as energy, food and pharmaceuticals. [Stobbie Decl. ¶9.] In addition to ramping up production of its 3M-branded respirators to meet increasing demand, 3M has not increased its U.S.

prices for disposable N95 respirators as a result of the pandemic, so that the public can obtain this critically necessary equipment at non-inflated prices. [Stobbie Decl. ¶10.]

Unfortunately, with the increase in demand and the short-term strain on supply, a number of wrongdoers have sought to exploit the current public health emergency and prey on vulnerable parties through a variety of scams and schemes involving 3M N95 respirators and other 3M PPE products. These schemes include practices such as price gouging, fake offers, counterfeiting, and other unfair and deceptive practices, all of which undermine the public's confidence in the marketplace and constitute an ongoing threat to public health and safety. [Stobbie Decl. ¶11.]

3M has been committed to confronting these unscrupulous parties head on and combating these activities. 3M has worked closely with law enforcement all over the world, including the U.S. Department of Justice, state Attorneys General, the FBI, and local authorities to stop and prevent price-gouging, counterfeiting, and other unlawful activity. [Stobbie Decl. ¶¶12–14.]

Among its public-facing efforts to combat unfair practices, 3M has created a website (see www.3m.com/covidfraud) and a "3M COVID-19 Fraud Hotline" for the public to use to get information and report potential cases of fraud, price gouging, and counterfeit activities. 3M has received reports of fraudulent and counterfeit sales, including by Defendants, through its COVID-19 Fraud Hotline. [Stobbie Decl. ¶¶12–14.] Moreover, 3M publishes information on its website about its anti-price-gouging and counterfeiting efforts, including disclosure of 3M's list prices for its N95 respirators so that customers can identify and avoid inflated prices, and the web address and phone numbers that can be used to

identify 3M authorized distributors and dealers in the United States and Canada. [Stobbie Decl. ¶12.]

Further, 3M has filed more than twenty lawsuits in courts—including this action—in its fight against fraud, price gouging, and counterfeiting. [Stobbie Decl. ¶13.] 3M has secured numerous temporary restraining orders and preliminary injunction orders from courts across the country that put a stop to other defendants' unlawful and unethical profiteering from the pandemic. [Stobbie Decl. ¶13.]

### c. Defendants' Sale of Counterfeit 3M Goods on eBay

Recently, 3M learned of Defendants' online sales of counterfeit 3M products. From 3M's review of the relevant product listings, review of product photographs supplied by customers who have purchased products from Defendants, and review of products purchased from Defendants directly by or on behalf of 3M, 3M has determined that Defendants are offering counterfeit goods bearing the 3M Marks. [Gannon Decl. ¶¶ 20-21.] True and correct copies of screenshots showing Defendants' counterfeit product offerings are attached as Exhibit 8 to the Complaint (submitted under seal) and with this Memorandum. [Gannon Decl. ¶¶ 20-21.] Both the product listings and the counterfeit 3M products offered by Defendants often contain similar irregularities and indicia of being counterfeit, suggesting coordination among Defendants, or at a minimum a common source of counterfeit goods. [Gannon Decl. ¶ 22.]

Defendants, like many sellers of counterfeit goods on interactive websites, rely on the supposed anonymity afforded by the Internet to escape detection and liability. Unfortunately, Defendants and similar counterfeiters circumvent the efforts of interactive

websites to vet sellers and confirm their identities, employing numerous strategies to hide their true identities, trade under multiple aliases and handles, in an effort to keep ill-gotten gains beyond the reach of their victims.

3M has not provided any authorization or license to Defendants to use the 3M Marks in connection with their advertisement, marketing, sale, distribution and/or shipment of 3M products, much less counterfeit 3M products. [Gannon Decl. ¶ 23.] Based on the ability to purchase and ship counterfeit products into this District using Defendants' eBay seller pages, Defendants are believed to be intentionally, knowingly and willfully using the 3M Marks in connection with advertisement, marketing, sale, distribution and/or shipment of counterfeit 3M products into the United States and Minnesota by means of interactive Internet websites. [Gannon Decl. ¶ 25.]

Online counterfeiters employ several tactics to evade enforcement efforts, such as registering new usernames or aliases upon receiving notification of claimed infringement or the filing of a lawsuit, as well as shipping small quantities of counterfeit product directly by mail, hoping to evade detection. [Gannon Decl. ¶ 26.] From a review of similar enforcement actions brought by other prominent mark owners, it is apparent that counterfeiters like the Defendants in this action also routinely use multiple payment and merchant accounts (e.g., through Aliexpress, Alipay, eBay, PayPal and others) to obfuscate payment streams and make tracing payment more difficult. Defendants may also maintain foreign bank accounts and use them to move payments beyond the jurisdiction of U.S. courts, further frustrating efforts to achieve adequate relief from Defendants.

## LEGAL STANDARD

The standards for a temporary restraining order and preliminary injunction are the same. *See Life Time Fitness, Inc. v. DeCelles*, 854 F. Supp. 2d 690, 694–95 (D. Minn. 2012). Under Rule 65 of the Federal Rules of Civil Procedure, such preliminary relief is appropriate when the movant establishes: (1) a likelihood of success on the merits; (2) irreparable harm in the absence of the requested relief; (3) the balance of the hardship tipping in its favor; and (4) that its request is in the public interest. *Buffalo Wild Wings Int'l, Inc. v. Grand Canyon Equity Partners, LLC*, 829 F. Supp. 2d 836, 841 (D. Minn. 2011) (citing *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir.2003)). Analyzing these four factors involves considering "whether the balance of equities so favors the movant" such that "justice requires" preliminary relief. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981).

## ARGUMENT

The Court should enter a temporary restraining order to stop Defendants from using 3M's famous marks to sell counterfeit goods to the public. There can be no doubt that 3M will succeed on the merits of its claims given the brazen misuse of 3M's trademarks by Defendants to sell their fake goods. Additionally, the harm to the public, as well as to 3M's goodwill and reputation, is urgent and ongoing, and it is irreparable absent immediate relief, especially during this critical time in a global pandemic where the failure or inefficacy of one of the counterfeit 3M N95 respirators offered by Defendants could mistakenly be imputed to 3M, and could put the user of such a counterfeit product at immediate risk of COVID-19 exposure. The balance of hardships indisputably weighs in 3M's favor, as

Defendants suffer no legitimate hardship from being prevented from continuing to perpetrate their illegal schemes through the sale of counterfeit 3M products. And finally, the public interest is certainly served by stopping Defendants' counterfeiting operations, not only to prevent confusion and deception as to source or affiliation caused by the unauthorized use of 3M's trademarks, but also to protect the public from Defendants' products themselves, which are of unknown origin, quality, and efficacy.

Additionally, because Defendants currently enjoy the relative anonymity offered by selling via eBay.com, this Court should enter an order directing eBay to restrain any assets in any payment accounts associated with Defendants' seller accounts to prevent them from dissipating such assets or hiding them beyond the reach of any potential order for recovery while this litigation remains pending. An order for expedited discovery is also warranted to allow 3M to ascertain the Defendants' true identities and prevent further harm that might be caused by Defendants' continued anonymity. This early relief will help to ensure that the temporary restraining order and any other relief that is granted in this proceeding is given meaningful effect.

## I. 3M Meets and Exceeds the Standard for a Temporary Restraining Order

### A. 3M Will Likely Succeed on the Merits

To obtain a temporary restraining order and preliminary injunction, 3M "need only show a reasonable probability of success, that is, a fair chance of prevailing" on one of its claims. *Paisley Park Enters., Inc. v. Boxill*, 253 F. Supp. 3d 1037, 1043 (D. Minn. 2017) (*quoting Kroupa v. Nielsen*, 731 F.3d 813, 818 (8th Cir. 2013)); *see also PCTV Gold, Inc. v. SpeedNet, LLC*, 508 F.3d 1137, 1143 (8th Cir. 2007).

- 11 -

### 1. 3M Can Show Trademark Counterfeiting and Infringement.

Here, 3M can plainly demonstrate it will prevail on the merits of its counterfeiting and trademark infringement claims. The Lanham Act creates civil liability for persons who, without a registrant's consent, "use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." *See DaimlerChrysler AG v. Bloom*, 315 F.3d 932, 936 (8th Cir.2003). A counterfeit mark is a "spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127. *See also* 15 U.S.C. § 1116(d)(1)(B).

In addition, to prevail on its claims for trademark infringement and unfair competition, 3M must show that Defendants are using the famous 3M Marks in a manner that is likely to create consumer confusion. *See, e.g., Roederer v. J. Garcia Carrion, S.A.*, 732 F. Supp. 2d 836, 863 (D. Minn. 2010) (*citing B & B Hardware, Inc. v. Hargis Indus., Inc.,* 569 F.3d 383, 389 (8th Cir.2009) *and Eniva Corp. v. Glob. Water Sols., Inc.*, 440 F.Supp.2d 1042, 1049 n. 3 (D.Minn.2006)). 3M is likely to prevail here as well, as shown below.

Courts in the Eighth Circuit assess the following *SquirtCo.* factors to evaluate likelihood of confusion: (1) the strength of the plaintiff's marks; (2) the similarity of the marks; (3) the degree to which the allegedly infringing goods or services compete with the plaintiff's goods or services; (4) the alleged infringer's intent to confuse or deceive the public; (5) evidence of actual confusion, if any; and, (6) the conditions of purchase. *See*

*Everest Capital, Ltd. v. Everest Funds Mgmt., L.L.C.*, 393 F.3d 755, 759-60 (8th Cir. 2005) (*citing SquirtCo v. Seven-Up Co.*, 628 F.2d 1086, 1091 (8th Cir. 1980)). Those elements are satisfied here.

**The Validity of the 3M Marks:**

There can be no question as to the validity of 3M's trademark registrations and rights appurtenant thereto. The 3M Marks in question are valid and incontestable, and the certificates for the '329, '036, and '534 Registrations serve as conclusive evidence of the validity of the 3M Marks. See 15 U.S.C. § 1115(b); 15 U.S.C. § 1065; *Select Comfort Corp. v. Baxter*, 156 F. Supp. 3d 971, 983 (D. Minn. 2016) ("Incontestability provides conclusive evidence of the mark's validity, its registration, the registrant's ownership of the mark, and the registrant's exclusive right to use the mark in commerce.").

**Defendants' Use Constitutes Counterfeiting and Is Likely to Cause Confusion:**
Here, 3M submits evidence to the Court that the goods offered by Defendant are not genuine, and bear reproductions of the 3M mark without authorization. In other words, they are counterfeit. This evidence is sufficient, by itself, to establish liability and likelihood of success on the merits under Section 1114.

The 3M Marks are not only conceptually strong—i.e., arbitrary or fanciful when applied to respirator products—they are also extraordinarily strong commercially. 3M has spent millions of dollars in advertising, marketing, and promoting goods and services under the 3M Marks; goods sold under the 3M Marks, including 3M's N95 respirators, generate billions of dollars in annual revenue; the 3M Marks are recognized and well-known in

households around the U.S.; and 3M has been the exclusive source of goods and services offered under the 3M Marks for many decades. There is no question that the 3M Marks are commercially strong. As one would expect, courts throughout the country have agreed— including specifically finding that the 3M Marks are strong in connection with respirators. *See 3M Co. v. Performance Supply*, LLC, 458 F. Supp. 3d 181, 194 (S.D.N.Y. 2020)(finding the 3M marks to be "commercially strong and famous" in connection with N95 respirators); *see also 3M Co. v. Christian Invs. LLC*, 2012 WL 6561732, at *9 (E.D. Va. July 12, 2012).

With regard to the similarity of the marks and the goods at issue, Defendants entirely reproduce the 3M mark in connection with products 3M also offers. In other words, the marks and goods at issue are identical. Consequently, this factor strongly favors 3M. *See, e.g., Safeway Transit LLC v. Disc. Party Bus, Inc.*, 334 F. Supp. 3d 995, 1006 (D. Minn. 2018) (finding this factor to favor the plaintiff where "the marks are identical"). Where identical marks are used in the same geographic area for the same class of goods or services, courts have not only held that this factor favors the plaintiff, but also that "likelihood of confusion is presumed." *E.g., Solutech, Inc. v. Solutech Consulting Servs., Inc.*, 153 F.Supp.2d 1082, 1088 (E.D.Mo.2000) (*cited approvingly by Cmty. of Christ*, 634 F.3d at 1009-10. *Microsoft Corp. v. Ion Techs. Corp.*, No. CIV.01-1769(JNE/JGL), 2003 WL 21356084, at *4 (D. Minn. May 30, 2003) (*citing Microsoft Corp. v. CMOS Techs., Inc.*, 872 F. Supp. 1329, 1335 (D.N.J.1994) ( "It would be difficult to imagine a clearer case of consumer confusion than the instant case in which the defendants, acting in direct competition with the plaintiff, sold counterfeit products on which plaintiff's registered marks appear in their entirety.")).

With regard to Defendants' intent, evidence of intent to deceive the public is not a requirement to prevail on an otherwise valid infringement claim, but such evidence strongly supports a likelihood of confusion, as well as the grant of preliminary injunctive relief. *See Advantus Capital Mgmt., Inc. v. Aetna, Inc.*, 2006 WL 2916840, at \*4 (D. Minn. Oct. 11, 2006) (*citing Mut. of Omaha Ins. Co. v. Novak*, 836 F.2d 397, 399 (8th Cir. 1987)). The intent to deceive "raises an inference of likelihood of confusion[.]" *SquirtCo v. Seven-Up Co.*, 628 F.2d 1086, 1091 (8th Cir. 1980). Here, Defendants are intentionally using the 3M Marks to confuse and deceive the consuming public into thinking that Defendants' Counterfeit 3M-branded products are manufactured by or emanate from 3M itself. Accordingly, this factor weighs in 3M's favor.

With regard to actual confusion, "[t]he test for infringement lies in the likelihood of confusion, not actual confusion; therefore, plaintiffs are not required to prove any instances of actual confusion." *Advantus*, 2006 WL 2916840, at \*4 (granting preliminary injunction); *see also Warner Bros. Entm't. v. X One X Prods.*, 840 F.3d 971, 981 (8th Cir. 2016) (noting that actual confusion is merely "a kind of proof a court may consider" and affirming verdict for the plaintiff in absence of actual confusion evidence). Further, where the alleged infringement has "only recently started . . . lack of actual confusion is not to be given significant weight." *J & B Wholesale Distrib. Inc., v. Redux Beverages, LLC*, 621 F. Supp. 2d 678, 687 (D. Minn. 2007). In this case, however, customer reviews posted online at Defendants' seller pages for product listings that 3M has identified as counterfeit show evidence of actual confusion, with customers believing they have purchased genuine 3M products. This factor therefore also favors 3M.

Finally, with regard to the conditions of purchase of the goods in question, courts look to "the type of product, its cost, and conditions of purchase." *Roederer* 732 F. Supp. 2d at 877 (D. Minn. 2010). Here, there is widespread demand for the type of product at issue—i.e., respirators. Although 3M has not increased its U.S. prices for disposable N95 respirators as a result of the pandemic, counterfeiters nonetheless take advantage of the high demand and relative scarcity to charge higher prices, knowing the public will pay them. In the context of online sales, where the customer has no meaningful opportunity to personally inspect the product to be shipped, the conditions of purchase exacerbate the potential for confusion. This factor therefore favors 3M's position and the grant of injunctive relief.

### 2. 3M is Likely to Prevail on its Additional Claims

In addition to claims of trademark counterfeiting and trademark infringement, 3M seeks relief against Defendants for false designation of origin under 15 U.S.C. § 1125(a), trademark dilution under 15 U.S.C. § 1125(c), and corollary claims under Minnesota law. 3M is equally likely to succeed on the merits of these claims.

3M is likely to prevail on its claim for false designation of origin. The relevant inquiry in a false designation of origin claim under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), aligns with the relevant inquiry for whether the public is likely to be deceived or confused by the similarity of the marks at issue, described above. *See generally Two Pesos, Inc. v. Taco Cabana. Inc.*, 505 U.S. 763, 780, (1992). Because 3M can demonstrate a likelihood of success on the merits of its trademark counterfeiting and infringement claims, 3M is equally likely to succeed on its claims for federal false designation of origin.

Similarly, 3M is likely to prevail on its claim for trademark dilution. Section 43(c) of the Lanham Act states in part that:

> Subject to the principles of equity, the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.

15 U.S.C. § 1125(c)(1). Here, Defendant's use of an identical "3M" mark long after the 3M Marks became famous, threatens to undermine the strength and selling power of the famous 3M Marks. In addition, some courts have upheld dilution by tarnishment claims based on the sale of inferior counterfeit goods offered under an identical mark, providing 3M yet another avenue for likely success on the merits of its claims. *E.g., Burberry Ltd. v. Euro Moda, Inc.*, 2009 WL 1675080, at *15 (S.D.N.Y. June 10, 2009).

## B. 3M Will Suffer Irreparable Harm Absent Immediate Relief

The harms occasioned by trademark infringement traditionally gave rise to a presumption of irreparable harm. In the wake of the *eBay Inc. v. MercExchange, LLC*, decision, whether that presumption of irreparable harm continues to hold true in trademark cases has been called into question. 547 U.S. 388 (2006). To date, however, both the Eighth Circuit and Courts in this District have continued to hold that trademark infringement claims carry a presumption of irreparable harm, which should apply here. *See Cmty. of Christ*, 634 F.3d at 1012 ("[I]n trademark law, injury is presumed once a likelihood of confusion has

been established"); *Warner Bros.*, 840 F.3d at 982 (8th Cir. 2016) (finding that likelihood of confusion exists results in a presumption that a threat of irreparable harm exists); *Munster Real Estate, LLC v. Webb Bus. Promotions, Inc.*, Case No. 18-2120, 2018 WL 5314951, at *4, at *9 (D. Minn. Oct. 26, 2018) ("Moreover, to the extent that Plaintiff has shown a likelihood of success on its trademark-infringement claim, the Court can presume irreparable harm.").

The use of an identical mark on competing counterfeit goods, standing alone, gives reason to assume that 3M will be irreparably harmed if left unchecked. *See, e.g., Gold's Gym Licensing, LLC v. K-Pro Mktg. Grp., Inc.*, 2009 WL 2253247, at *2 (D. Minn. July 28, 2009) (finding defendant's use of identical marks threatened irreparable harm). Here, the potential for irreparable harm is exacerbated by the fact that the counterfeit products at issue are critical health products needed to reduce the transmission of the COVID-19 virus, and Defendants' counterfeit products are likely less effective at doing so. This creates an enormous and imminent risk to the health and safety of those who purchase and use Defendants' counterfeit products, which is both irreparable and incalculable. In addition, the potential damage to 3M's reputation and goodwill, along with the possibility of customer diversion and disappointment from receiving potentially inferior imitation products during a time of great need, also creates a threat of irreparable harm. They are precisely the type of injuries that warrant an immediate halt to Defendants' infringing activities through injunctive relief. In similar contexts, courts in this District have granted injunctive relief, particularly where counterfeiting was at issue. *E.g., George & Co., LLC v. Xavier Enterprises, Inc.*, No. CIV 09-2973 DWF/RLE, 2009 WL 4730331, at *3 (D. Minn.

Dec. 4, 2009) (granting TRO against counterfeit use of registered mark); *see also 3M Company v. Starsiak, et al.*, Civ. No. 20-cv-01314-SRN-DTS [Dkt. 37] (D. Minn. June 26, 2020) (granting a TRO for misuse of the 3M mark in connection with the offer of respirators). Both 3M and the public will suffer immediate and irreparable injury, loss, or damage if an ex parte Temporary Restraining Order is not issued in accordance with Federal Rule of Civil Procedure 65(b)(1). [Gannon Decl. ¶¶ 27-33.]

**C. The Balance of Hardships Weighs In 3M's Favor**

Defendants are willful counterfeiters; enjoining them from activities that are already unlawful cannot be considered a hardship. *See, e.g., Krause Int'l Inc. v. Reed Elsevier, Inc.*, 866 F. Supp. 585, 587-88 (D.D.C. 1994) ("When considering the balance of hardships between the parties in infringement cases, courts generally favor the trademark owner."). *Burger King Corp. v. Majeed*, 805 F. Supp. 994, 1006 (S.D. Fla. 1992) ("One who adopts the marks of another for similar goods acts at his own peril since he has no claim to the profits or advantages thereby derived.") (internal quotations omitted). To date, Defendants have been profiting from the sale of counterfeit 3M-branded N95 respirators. By contrast, 3M observes additional sales of counterfeit respirators, with sales continually tallied on seller pages on eBay. Unless and until enjoined, Defendants' conduct will continue to cause ongoing harm to 3M's rights.

**D. The Requested Relief Is in the Public's Interest**

The public has a strong interest in being protected from fraud and deceit in the purchase of PPE. Defendants' fraudulent sales of these counterfeit respirators jeopardizes the health and safety of healthcare workers, first responders, and the public who believe

they are purchasing genuine 3M N95 respirators that meet the N95 standard. While 3M N95 respirators are subject to strict quality control standards, the products offered by Defendants are of unknown provenance: the public has no way of knowing who is making them, with what materials, and with what (if any) quality control and health safety measures. This unlawful activity poses potentially serious health consequences for the public, justifying immediate judicial intervention. Indeed, "preventing customer confusion and infringement of trademarks" is at the core of serving the public interest. *Buffalo Wild Wings*, 829 F. Supp. 2d at 847 (*citing Gold's Gym*, 2009 WL 2253247, at \*2 and *Am. Dairy Queen Corp. v. New Line Prods., Inc.*, 35 F.Supp.2d 727, 733 (D. Minn.1998)).

## II. Preventing the Fraudulent Transfer of Assets is Critical

Among other remedies, 3M seeks recovery of Defendants' profits from their wrongful use of the 3M Marks in connection with sales of counterfeit PPE. The Court is authorized to freeze Defendants' assets as part of a TRO request under its significant equitable powers. Several Courts of Appeal have found that freezing assets is a warranted remedy to preserve the possibility of recovery in counterfeiting cases, particularly where such counterfeiting involves overseas and/or online defendants and assets. *See, e.g., Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 987–88 (11th Cir. 1995) (affirming preliminary injunction freezing assets of U.S.-based defendants who arranged for making counterfeit Levi's jeans in China for sale in Europe); *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 132–33 (2d Cir. 2014) (confirming trial court could issue TRO and preliminary injunction freezing assets of defendants alleged to be selling counterfeit goods online); *Animale Grp. Inc. v. Sunny's Perfume Inc.*, 256 F. App'x 707, 709 (5th Cir. 2007) (affirming

TRO and preliminary injunction freezing assets of defendants selling counterfeit goods); *see also Chanel, Inc. v. Sunus Online Group, LLC*, 2014 WL 12558780, at *3 (C.D. Cal. Jan. 15, 2014) ("based on Defendants' blatant violations of trademark laws there is likelihood that Defendants would transfer or hide the illegally obtained assets in order to avoid a judgment in this action . . . ").[1]

This action involves blatant unauthorized use of the 3M Marks by Defendants, in their advertising for PPE and on the packaging for such product. Defendants maintain anonymity through their use of seller identities on eBay, and therefore present elusive targets for enforcement of any potential award. It is likely that Defendants can and would dissipate their assets during the pendency of this case if given the opportunity to do so; and it would in many cases be difficult if not impossible to enforce any eventual judgment against Defendants abroad, should Defendants be found to reside outside the United States, which is true of many counterfeiters. *See, e.g., Yee v. NIVS Intellimedia Tech. Group, Inc.*, No. CV 11-8472 JGB (AJWx), 2013 WL 1276024, *5 (C.D. Cal. March 25, 2013) (stating that Chinese company whose executives are Chinese residents "bore no real risk of sanctions" given the difficulty of enforcing a U.S. judgment against a Chinese national); *Redwen v. Sino Clean Energy, Inc.*, No. CV 11-3936 PA (SSx), 2013 WL 12303367, at *5–6 (C.D. Cal. Jul. 9, 2013) (finding that the plaintiff "would face significant obstacles in enforcing any judgment against the defendants' assets abroad").

The Court's authority to freeze assets extends to banks and other non-parties that have custody of Defendants' assets or provide payment services to Defendants. *See, e.g.,*

---

[1] 3M would donate any recovery from this action to charitable COVID-19 relief efforts.

*Reebok*, 737 F. Supp. at 1527–28 (issuing a TRO and preliminary injunction stating that "any banks, savings and loan associations, or other financial institutions ... who receive actual notice of this order by personal service or otherwise, are preliminarily enjoined from transferring, disposing of, or secreting any money, stocks or other assets of these defendants, until further order of the court"); *Gucci Am., Inc.*, 768 F.3d at 133 (rejecting argument that plaintiff had to identify particular property derived from counterfeiting before obtaining TRO and preliminary injunction freezing all assets).

## III.    3M Is Entitled to Expedited Discovery

As a default under Rule 26(d)(1) of the Federal Rules of Civil Procedure, a party may not seek discovery from any source before the parties have met and conferred as required by Rule 26(f). The Federal Rules also provide exceptions to that general rule, however, where expedited discovery is warranted, for good cause shown. "Under the good cause standard, the party requesting expedited discovery must show that the need for expedited discovery, in consideration of administration of justice, outweighs prejudice to responding party." *Kennedy v. ITV Direct, Inc.*, No. CV 08-6244 (ADM/JSM), 2009 WL 10678523, at *3–4 (D. Minn. Jan. 8, 2009) (granting request for expedited discovery in case involving counterfeit goods); *see also El Pollo Loco, S.A. de C.V. v. El Pollo Loco, Inc.*, 344 F.Supp.2d 986, 991 (S.D. Tex. 2004) (citing 8 Charles A. Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure: Civil 2d § 2046.1 (West 1994)) ("A court should only issue an order for expedited discovery if there is some showing of good cause to justify the order."); *Pod-Ners, LLC v. Northern Feed & Bean of Lucerne Ltd. Liability Co.*, 204 F.R.D. 675, 676 (D. Colo. 2002) ("Rule 26(d), Fed.R.Civ.P., allows [the

court] to order expedited discovery upon a showing of good cause.").

Here, good cause exists to grant 3M's request for expedited discovery. The information 3M seeks to uncover through expedited discovery is necessary for 3M to trace the identity of otherwise anonymous Defendants. *See, e.g., Arista Records, L.L.C. v. Does 1-54*, 2008 WL 4104563 at *1 (E.D. Mo. Aug. 29, 2008) (permitting expedited discovery to identify defendants). In addition, there is potential for ongoing infringement through the continued distribution of counterfeit products if transferred to other seller accounts and aliases controlled by the same person or persons named in Schedule A to the Complaint, providing good cause to immediately learn the identities and contact information for such sellers.

Further, information sought in expedited discovery would assist 3M in its pursuit of a preliminary injunction. *See El Pollo Loco, S.A. de C.V.*, 344 F.Supp.2d at 991 ("An order for expedited discovery would be appropriate in a case seeking a preliminary injunction."). *See also OMG Fidelity, Inc. v. Sirius Technologies, Inc.*, 239 F.R.D. 300, 305 (N.D.N.Y. 2006) ("[P]articularly given that plaintiff contemplates a motion for a preliminary injunction, depending upon the results of its proposed discovery efforts, it is clear that plaintiff will potentially be unfairly prejudiced should [the court] not permit discovery to go forward since it will not have an early opportunity to develop evidence for use in support of such a motion.").

The discovery sought will not prejudice defendants. The expedited discovery at issue primarily targets third-party service providers who possess information about the Seller Identities listed in Schedule A to the Complaint.

## IV. 3M Should Not Be Required to Post a Bond

Federal Rule of Civil Procedure 65(c) provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).

3M should not be required to post bond for the relief sought here. 3M is not seeking an injunction against legitimate business competitors; it is seeking to prevent fraudulent counterfeiting operations. Defendants have no recognizable financial interest in their schemes, and a bond is not required where no damages would result from the wrongful issuance of an injunction. *See Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Engineers*, Case No. 13-cv-2262, 2015 WL 3887709, at *2 (D. Minn. June 24, 2015) (citing *Bukaka, Inc. v. Cnty. of Benton*, 852 F. Supp. 807, 813 (D.Minn.1993)); see also *Portz v. St. Cloud State Univ.*, 196 F. Supp. 3d 963, 978–79 (D. Minn. 2016) (no bond necessary where injunction unlikely to result in costs and damages); *Benefits Admin. Comm. of Brush Aftermarket N. Am., Inc. Grp. Pension Plan v. Wencl*, Case No. 16-cv-2794, 2016 WL 8809478, at *3 (D. Minn. Aug. 22, 2016) (no bond for TRO where it was unlikely to cost enjoined party anything); see also *FSL Acquisition Corp. v. Freeland Sys., LLC*, 686 F. Supp. 2d 921, 933 (D. Minn. 2010) (no bond where damages are too speculative to determine).

Should the Court decide in its discretion that a bond should be required, the circumstances of this case would require only a modest bond. *See generally Hill v. Xyquad, Inc.*, 939 F.2d 627, 632 (8th Cir. 1991); *Novus Franchising, Inc. v. AZ Glassworks, LLC*, 2012 WL 5057095, at *10 (D. Minn. Sept. 27, 2012) ("Because of Novus's high likelihood

of success on its trademark infringement claim against Capital One—Novus never authorized Capital One to use any of its marks—this Court finds that a bond of $5,000 will be sufficient.").

Dated:  November 17, 2020

**GREENE ESPEL PLLP**

s/ Sybil L. Dunlop
Jenny Gassman-Pines, Reg. No. 386511
Sybil L. Dunlop, Reg. No. 0390186
222 S. Ninth Street, Suite 2200
Minneapolis, MN 55402
jgassman-pines@greeneespel.com
sdunlop@greeneespel.com
(612) 373-0830

**PIRKEY BARBER PLLC**

Christopher Weimer (pro hac vice forthcoming)
Alexandra Bistline (pro hac vice forthcoming)
David Armendariz (pro hac vice forthcoming)
1801 East 6th Street, Suite 300
Austin, Texas 78702
Telephone:    (512) 322-5200
Facsimile:    (512) 322-5201
cweimer@pirkeybarber.com
abistline@pirkeybarber.com
darmendariz@pirkeybarber.com

*Attorneys for Plaintiff 3M Company*